May it please the Court, the Trial Court's decision should be reversed for at least three reasons. First, in assessing LaSalle's dividend damages claim, the Trial Court was required to determine the dividends that the bank would have paid in the absence of the breach so as not to place LaSalle in a better position than it would have occupied. How do you do this? Isn't this awfully hard to go back and figure what might have happened? Well, LaSalle didn't think it was very hard because in the first trial, Your Honor, LaSalle presented a model showing the dividends that it would have paid in the absence of the breach, and that's at A2007033. And regardless of whether it is difficult, the burden falls on LaSalle to show that it would have paid in the absence of the breach. So even if it is a difficult process, and again, LaSalle didn't think it was too difficult since it measured the dividends that it would have paid in the absence of the breach directly, the burden falls on them to show no breach world versus the breach world. It failed to do that. The Trial Court at times appeared to recognize the obligation to do so and specifically recognized it, 64 Fed Claims 110, that the government says that all the dividends that Tallman would have paid in the absence of the breach have to be accounted for. The Court then said when the government does that, it shows that there are no damages. The Court said that's inconsistent with this Court's remand order with regard to dividends, that it in essence had to find some dividend damages. But there is nothing in this Court's initial decision that suggested that there had to be dividend damages. To the contrary, at 317F3R1375, this Court said, dividends were paid out of earnings and the earnings appear to have exceeded A.B. and Amaro's hurdle rate as well as Tallman's projected earnings but for the breach. In fact, the Court is saying, it looks to us that there may not be damages here, but go back and figure it out. And the Court was under the obligation in figuring out whether there were dividend damages to determine whether there were more dividends paid because of the breach than there would have been paid absent the breach. That's clear from this Court's decision in Bluebonnet. That's clear from this Court's decision in Hughes, which LaSalle cites. Hughes specifically states that in order to recover damages, the plaintiff must show that it would not have incurred the claimed cost but for the breach. Here if LaSalle or if Tallman Bank would have paid a similar amount or greater dividends in the absence of the breach, then there can be no dividend damages. The trial court purported to make some adjustment for but for dividend costs after saying, when you measure them directly, the government shows that there are no dividend costs, but I can't go with that because I think that's inconsistent with this Court's, with the Federal Circuit's initial decision here. The Court made an adjustment based on Abey and Amro's purchase of Tallman's stock for $97 million. But that certainly doesn't account for but for dividends. In the absence of the breach, LaSalle, excuse me, Tallman didn't have $97 million in capital. It had more than $500 million in goodwill, which it was leveraging up to generate earnings on a $6 billion bank and pay dividends. So the dividends that Tallman was paying or would have paid in the absence of the breach can't be accounted for by looking at this post-breach $97 million purchase price. There's no connection between those two. Well, no, you recognize there's no dividends on goodwill. Well, certainly the bank was paying dividends in the absence of the breach where its only positive capital was the goodwill. Yes, there are dividends on goodwill, Your Honor, because both before and after the breach, the bank paid dividends not based on amounts of capital infused, but based on earnings. That's clear. And we've cited the dividend policies both before and after the breach. Specifically, before the breach, Tallman's dividend policy. Let me find that for you, Your Honor. Page A2002564 of the appendix. This is pre-breach. Tallman is talking about its dividend policy. And it says, its policy is to continue paying dividends to common stockholders and to gradually increase the rate of dividends per share as permitted by past and future projected earnings, having nothing to do with amounts of capital, but based on projected earnings, with an ongoing guide that such dividends in the aggregate should not exceed one-third of net income. That is similar to the dividend policy that AB and AMRO ultimately adopted. So it's no surprise that but-for dividends and actual dividends related to the $300 million infusion would be similar. You mentioned dividends on the $97 million shouldn't have been included. Weren't those cut out? We made two arguments to the trial court, Your Honor. One is with regard to the $97 million and with regard to but-for dividends. First, you must account for but-for dividends directly. When you do that, it shows that there are no damages. However, court, if you reject that argument, you shouldn't because the law requires it. But if you reject that argument, you at least have to, under LaSalle's model, attribute dividends to the $97 million. You can't just attribute dividends to AB and AMRO's $300 million infusion. You also have to attribute it to the $97 million. But that was always a backup argument. Our first argument, and this is clear from the court's opinion, when it rejects our first argument that all but-for dividends must be accounted for, if you reject that argument, then you must address the second argument with respect to the $97 million. So it was always a secondary argument, Your Honor. Mr. Aran, I believe you said earlier that the trial court didn't take into account or didn't consider the but-for damage model. Is that correct? There was no but-for damages model. LaSalle didn't present it. LaSalle took the position, you only look at the dividends paid post-abreach. It didn't present a but-for model. We said, look at LaSalle's initial, an exhibit LaSalle presented at the initial trial. And again, that's at A2007033 of the appendix. And we said, look at LaSalle's but-for dividend projections from the initial trial. LaSalle took the position that you don't need to look at the but-for world at all. That's simply incorrect under the Bluebonnet decision in this court. But what about the language from the trial court that we believe, however, that some accounting must be made of pre-breach dividends? Admittedly, this is something plaintiff's model does not do. And as we discussed below, plaintiff's model must therefore be adjusted. Doesn't that suggest that the pre-breach circumstances were indeed considered? Well, that was after the court rejected our initial argument that you must measure the pre-breach dividends directly. And if I can point the court to 64 Fed Claims 109, carrying over onto 110. The trial court says, defendant's argument is that all dividends that would have been paid to shareholders but for the breach must be treated as an avoided cost in the actual model. That's our first argument that we presented to the trial court. The trial court then goes on to recognize at the top of page 64 Fed Claims 110, Professor Thacker points out, for example, that common stock dividends of $1.9 million were paid in 1988, $2.4 million in 1989. By projecting the growth of these dividends into the future, defendant swamps plaintiff's damages claims with avoided costs. That was our main argument. The court rejects that. The main reason the court offered for rejecting that was defendant's argument, and this is again on 64 Fed Claims 110. Defendant's argument, in any event, is incompatible with the remand order. If all actual dividends are canceled out by avoided costs, there is no room to implement the plain direction of the federal circuit to isolate costs specifically associated with the new capital infusion. So the court rejected our argument that you need to look directly at the but-for dividends. And then it said, well, I'm going to try, nevertheless, I'm going to try to make some accounting for but-for dividends. And it looked at the $97 million purchase price. But that was insufficient. The $97 million would not have been there in the but-for world. So to attribute dividends between the $97 million and the $300 million capital infusion does not capture the but-for world. What captures the but-for world is the model LaSalle presented at the initial trial where it said, here are our but-for dividends. All right, I see your point. Second, even if we skip over the part of the court's decision where it doesn't attribute any dividends to the but-for world, the court's decision needs to be reversed, nevertheless, because it relieved LaSalle of the obligation to prove proximate cause with regard to $403 million in dividends. These were so-called special dividends, where LaSalle explained that it was not paying dividends in order to repay the Avian Amaro for its $300 million infusion, but to provide a return to Avian Amaro on its $300 million infusion. It specifically said, we have, quote, excess capital in the bank that we want to pay to Avian Amaro to bring our capital ratios more in line with our peers. They specifically said, LaSalle did, that those dividends didn't have any proximate connection to the breach or the capital infusion. Those cannot be included in damages. Similarly, in 1999, there was a $93.1 million dividend, and this is undisputed, where Avian Amaro had LaSalle move a mortgage banking subsidiary to another subsidiary of Avian Amaro. That was a business decision that simply had nothing to do with the breach. LaSalle has no answer to this argument. It does not point out in any way where this repatriation of excess capital and this movement of a mortgage banking subsidiary from one sub to another has anything to do with the breach or the capital infusion. Of course, the dividends here were stipulated between the parties, weren't they? There's no dispute. But on the basis of the thinking and the legal rulings of the trial court. Correct, Your Honor. Which is what you're complaining about. We're complaining about the initial ruling of the trial court. The trial court instructed the parties, based on our ruling, defendant, you're not waiving anything, based on our ruling, determine the amount of damages, and we did that. And so we haven't waived any of the arguments. Finally, the court need not reach the tax gross-up issue if it agrees with us that the trial court failed to take into account the but-for world. But the tax gross-up aspect of the trial court's decision also should be rejected. We don't speak for the- Why should it be rejected if home savings set out the rule? Home savings specifically said that the trial court did not clearly err, it did not commit an abuse of discretion, and it was not clearly erroneous in finding that there would be a gross-up in that case. But the cost of replacement model in that case had to do with preferred stock dividends and debt, debt which involved interest payments that could be written off for tax purposes. And so therefore, where we have common stock dividends in this case, we have a different situation. And as I was saying, although we don't speak for the IRS, the law appears strongly to be that if an award of damages constitutes a return of capital as opposed to an accession of plaintiff's wealth through lost profits, then the award itself is not taxable. That appears to be clear from the Supreme Court's decision in Burke and among other decisions, the Maffie decision and the Raytheon decision from the First Circuit. Thank you very much. Okay. Thank you, Mr. Ryan. Mr. Boyce. May it please the court, I'd like to briefly review what Judge Brugink did, the mechanism that he used following the directions from this court, and then address the two points that the government has addressed as their main points on appeal. The directions that Judge Brugink had coming from this court were that the cost of replacement capital was an appropriate measure of damages. All capital raised by a corporation has a cost. The cost could be established, the payment of dividends is a capital cost. So that's the directions he was given with an offset for the benefit of having real equity capital. That was in effect the remand instruction. He followed that in detail, as did we. We did not present some sort of hypothetical cost of replacement capital model. And what Judge Brugink did was he took the actual dividends that were paid to the new parent, ABN Amaro, in exchange for the $300 million capital investment. He excluded larger dividends that were paid in later years as a result of new capital contributions. He used a declining balance of the supervisory goodwill, because it was a shrinking item, or would have been. He counted only the dividends that were paid from actual retained earnings. In those instances where the bank paid a dividend that came out of capital at one point, he didn't count that one. He did give a credit for the benefit of replacement capital, as this court had directed. The way that he did that was he did an adjustment for the benefit of earnings on having equity. They were earning, whatever they were earning year to year, that's the actual amount that he used. So that was another deduction. The equity was the 97 million? No, that's not. That was a second deduction. The first deduction that he took was because supervisory goodwill couldn't earn anything, it didn't have any positive value. The 300 million, they could put it in treasury bills, they could get earnings on it, he did an adjustment for that. The second adjustment that he did, that the government brief spends ten pages arguing he didn't make, Judge Linn, the second adjustment he did make. He did an adjustment for dividends related to the capital already in the bank, the so-called but-for dividends. That was his 97 million, 300 million adjustment. The result of all of this was a calculation based on actual damages, actual dividends paid of $147 million. It is not, unfortunately, in the real world, close to the projected or 12% hurdle rate return that the owners thought they would have liked to get. It came out to be 6.43%. That's in an after-tax dividend yield on mitigation capital chart in the record at A2008908. Now, if I could turn to the government. Excuse me, isn't there something though to the argument that Judge Brueging's analysis was not what one would term an expected but-for analysis? Here's what Judge Brueging did, Your Honor. It is as close as possible to the actual circumstances. He looked at the, first of all, let me say that it was the same approach that he used in the home savings case, which this court has now affirmed on appeal in the home savings case. What he did was, in home savings, and again in this case, he put aside an amount for the equity in the bank and didn't calculate any damages on it, calculated damages only on the new equity. In the case of home savings, I believe they had outstanding common stock. They got new preferred stock. He counted damages only on the new preferred. That has been affirmed by this court. He did essentially the same thing here. $97 million had been paid out to the shareholders. There was no way that ABM could earn any money on that except through stock appreciation. 300 million went into the institution. They got all their earnings out of that. But nonetheless, he put that amount aside. Now, if he didn't do that, if he took the approach that the government is arguing for, what would happen? In reality, what would happen, we on the plaintiff side of these cases say the government arguments somehow always get to zero damages. But in reality, what he is saying is, allocate every dime of the dividends to the 97 million that was paid out to the old shareholders. Don't allocate a dime to the 300 million, new contribution. What's wrong with that? It's wrong because it is contrary to what this court directed when this court said capital is not costless to the investor or the recipient, and there should be a damages award for the payment out. And the government proposal would completely avoid that. How would they avoid it? They would not avoid it based on the actual record of what happened after FIREA. They would avoid it by using a projection that their expert did. This court, in the prior opinion, pointed out that the hurdle rate wasn't really a good thing to look at. Why is that? It doesn't reflect actual experience. Neither does the government proposal by Professor Thacker. His proposal on how to do this is you take the past dividend history for two years before 1992, before FIREA. You ignore everything that happened after FIREA. You project that forward based on operating plans. You project that forward based on assumed earnings increases, not related to actual dividend experience. So they're going off in a different direction than actual reality. And I would point out again that Judge Brugink had to come up with a methodology. It certainly was not an abuse of discretion to come up with a methodology in which he looked at actual dividends, the actual $300 million contributed, the actual $97 been paid for the old common, and came up with and adopted a calculation that was not our proposal. We tried to avoid this reduction. But he came up with it. And it resulted in a recovery of around 6% on the $300 million. That is not an unreasonable result. With respect to the tax gross up, I take it your position is that what Judge Brugink did was entirely consistent with home savings. It was entirely consistent with home savings. We've addressed it in detail in our brief. I would only point out that when it comes to what's taxable or not, the way that Judge Brugink handled this had the effect of saying explicitly that what we were getting here was a reimbursement of a cost, which is going to be a taxable item under the tax law. What we are not getting is new capital. He says that flatly, plus which, Your Honor, in the real world, you notice my opposing counsel says they don't speak for the Internal Revenue Service. They didn't bring the Internal Revenue Service in. We brought in our head of taxes. And we said, frankly, we're going to pay the tax on this. It's already built into our assumptions. We see no way to avoid paying the tax. That's the position we're moving on. The government asks us to assure that it is in the taxable loop. Is your view that there's anything left to be done? Nothing left to be done, Your Honor. We've addressed that in the brief. We think, technically, the Court of Federal Claims wouldn't even have the jurisdiction to do that. But we believe that that's been fully resolved. We're committed to paying the taxes. If I could address the issue of the parent subsidiary. As this was an open matter, it was remanded with the court to consider it one more time. Judge Brugink did so. There were suggestions by the government, still in these briefs, that there was some sort of manipulation of the dividends. That's a serious accusation. It was not supported by any evidence. Judge Brugink made affirmative findings twice that there was no manipulation of the dividends. That's in his opinion at page 111 and 114. As to the mandatory and special dividend distinction, let's review what Judge Brugink did instead of relying on that distinction. He decided this, and this is a quote from his opinion, based on the source of the funds, not the name of the dividend. And what he did again was he counted all of the actual dividends that were paid out of earnings as a payment for the cost of the new capital. He put aside those actual dividends that from time to time were paid out of the capital accounts because the distinction that he developed is one is a return on the capital. One is a return of the capital. The government tells you that that's an unknown distinction. Well, it's not unknown to the treatises that we cited. It's not unknown in the world of economics. It's certainly not unknown to the Internal Revenue Code. And we quoted in our brief at page 32 where the Internal Revenue Code indeed recognizes taxable dividends as being those that are a return on the capital. This decision, this approach that he took was not only a reasonable methodology, it was completely supported by the testimony at the trial. He saw the dividend policies. The dividend policies essentially called for, you gotta have mandatory dividends every quarter because you've gotta get some money to the parent company so it can, as Harry Tempest, the CEO testified, keep the lights on because the holding company doesn't have any other source of earnings. The rest of the money they divided up in special dividends from time to time when they could. Now, what did the witnesses in the seven-day trial say about this? We've quoted them in our briefs, but Mr. Tempest, the CEO of the parent company said, whether we call it a special dividend or a mandatory dividend or whatever, if it came out of retained earnings, it was a return on the capital that we had invested in the company. Judge found him to be a credible witness. Mr. Tempest is a prominent international banker. He's a retired FBI agent. The judge found him to be a credible witness. Mr. Roberts had been CEO of Tallman. He became CFO of the parent company. What did he say? Periodically, you'll pay special dividends when you feel you have the wherewithal to do so. Mr. Roberts was a credible witness. He's the former chairman of the Federal Reserve Bank of St. Louis. He was asked by the federal government to step in and revive Tallman. Mr. Heitman, who was the operating chief executive of LaSalle Tallman, the subsidiary, when these big dividends were paid that the government says shouldn't count, said this. This is his testimony. Every time we pay a dividend, whether it was a mandatory regular dividend, whether it was a special dividend, if it came out of retained earnings, it was a return on the investment. Now, the government argues that there was some failure to prove causation for the individual dividends. But as you've heard from what I've told you, the witnesses said, we were there. Every single one of these dividends was a repayment on the 300 million. The causation is directly established. What Judge Brueghink did followed the directions of this court to reflect the actual experience that the dividends were paid out of earnings. That's a quote from this court's prior opinion, and he followed that. This court also said a payment of a return on capital reflects the cost of the capital. That's the approach that he took. That's the approach that's been followed. In fact, the LaSalle-Tolman prior opinion was recently cited in the Old Stone case as an example of a case where causation had been established and damages can be measured by the dividends paid to the issuer. The judge, in effect, as to causation, said this. I need to look. I find, I'd already found, that there was a need to replace the capital. This court found that there was a need. It was compelled by firea. They had to get $300 million on short notice. They did. They had to pay dividends on the whole 300 million. The acquiring company expected to get the dividends, and it did. That's the factual basis supporting the position that the infusion of capital caused the payment of dividends on the whole 300 million. Finally, of course, the government's position is, well, government lawyers, there were no witnesses to support supporting this, but they say, well, some of these were mandatory. Some of them were not mandatory. Only the mandatory ones should count. That is the position, candidly, that Judge Bregink took in the first trial when he refused to award us any large damages because these dividends were not a required payment. That is the point on which this court reversed him and said, look at what actually happened. Your requirement of paying only debt where there was a contract is too narrow. Look at the actual dividends paid on the equity. Judge Bregink specifically recognized, in his opinion, that the government position here was parallel to the position on which he had been reversed. And finally, again, let's look at the result. Is this an abuse of discretion? Is this clear error? What he ended up with is looking at the actual testimony on what actually was done. And the result, again, is an amount, $147 million. It is actually less than the total contributed capital. It actually, for the long time period involved, is a return of about 6%. It's a reasonable result based on the record, entirely on the record. I have no other points unless the court has questions for me. Thank you, Mr. Bones. Thank you. Mr. Ryan. Thank you, Your Honor. LaSalle again takes the position that the court need not look at the but-for world in this case. It can, in effect, give LaSalle costs that it would have incurred in the but-for world. That is directly contrary to this court's decision in Bluebonnet, where the court said to derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach. That is the law. Abuse of discretion is not the standard on this. But the issue is, the principle of the question is how is that measured? And LaSalle says the government comes in with these projections. Again, we didn't make the projections. LaSalle itself made the projections in the first trial. We're only saying hold LaSalle to the projections it made in the first trial, where it said, yes, we would have continued paying dividends in the but-for world, and here is the amount of but-for dividends. If you take those dividends, they didn't experience any net dividend costs because of the $300 million infusion. That's how you do it. You take LaSalle at its word. Second, Mr. Boyce pointed out a couple of times that Abian-Amaro didn't meet its hurdle rate. That is a red herring, Your Honor,  Abian-Amaro didn't look at dividends. As Mr. Roberts testified, and as Abian-Amaro's documents suggest, in determining whether it met its hurdle rate, it looked at earnings from the subsidiary, not the dividends that were paid. Mr. Roberts said at page A-1000585 of the testimony, asked what the hurdle rate was. This was the rate of earnings on their investment, which they established as a requirement to justify their equity investment. Has nothing to do with dividends. The hurdle rate had to do with earnings. LaSalle made $1.8 billion from 1992 through the date of trial. Abian-Amaro more than met its hurdle rate. Mr. Boyce also suggests that we are saying that there should be zero damages. We're not saying that there should be zero damages. We're not challenging $8.3 million of the award for lost profits and for incidental costs. And finally, Your Honor, LaSalle says that just because a dividend came from retained earnings, causation is proved. None of the testimony that Mr. Boyce read you suggests that the witnesses said that the payments from retained earnings, where LaSalle said it was repatriating excess capital and shifting a mortgage banking subsidiary to another subsidiary, had any connection whatsoever with Abian-Amaro's $300 million infusion. For these reasons, the trial court's decision should be reversed, except for the $8.3 million award for lost profits and incidental damages. Thank you. Thank you. Thank you, Mr. Ryan, Mr. Boyce. The case is taken into submission.